**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**UNITED STATES OF AMERICA**

**v.** **Case No. 3:25-cr-236-JEP-SJH**

**TYLER BRUCE MCCLURE**

---

# SENTENCING MEMORANDUM

Defendant, Tyler McClure, by and through undersigned counsel, files this Sentencing Memorandum for this Court's consideration in anticipation of the Sentencing Hearing set for Wednesday, October 14, 2026, at 2:00 PM. Submitted along with this Memorandum are Exhibits, including letters from family members, photographs of Mr. McClure and his family, educational records, mental health records, and family court records.

## Appropriate Sentence and Applicable Law

Mr. McClure pled guilty to Count I, pursuant to a plea agreement that calls for the dismissal of Count II. Count I is punishable by a minimum of five years and a maximum of 20 years in prison. Any imprisonment is to be followed by a minimum of five years and a maximum of life on supervised release. There are also significant collateral consequences resulting from Mr. McClure's conviction.

In addition to being labelled a convicted felon and losing various civil rights, he will also be subject to federal and state requirements under the Sex Offender Registration and Notification Act (SORNA). He will be labelled as a "tier II sex offender" under federal law.[1] This requires continued registration for 25 years after his release from imprisonment, regardless of the laws of the local or state jurisdiction where he resides.[2] He must also appear in person to verify and/or update his information in the local sex offender registry at least once every 6 months.[3] Under Florida law, Mr. McClure will likely be designated as a "sexual offender."[4] With this designation comes multiple registration and notification requirements that Mr. McClure will have to abide by for at least 25 years or the remainder of his life.[5] Violation of the Florida requirements will subject him to prosecution for a third or second degree felony, punishable by a maximum of five years or fifteen years in state prison.[6]

There are many other legal and extralegal consequences that Mr. McClure will suffer because of his conviction in this case. There are state and federal regulations preventing him from obtaining certain occupational

---

[1] *See* 34 U.S.C. § 20911(3)(B)(iii) (defining "tier II sex offender" as including a person convicted of "distribution of child pornography.").
[2] 34 U.S.C. § 20915(a)(2).
[3] 34 U.S.C. § 20918(2).
[4] *See* Fla. Stat. § 943.0435(1)(h)(1)(a)(I) (designating as a "sexual offender" any person convicted of violating Fla. Stat. § 847.0137 "or similar offenses in another jurisdiction"). Section 847.0137 prohibits the "transmission" of CSAM.
[5] *See* Fla. Stat. § 943.0435(11).
[6] *See* Fla. Stat. § 943.0435(4), (7)-(9), (13).

licenses. States and local jurisdictions have varying law regarding where sexual offenders are permitted to reside. Individual employers may be unwilling to hire someone with his record and landlords may be unwilling to lease to him.

This Court has no control over collateral consequences but is tasked with deciding the appropriate prison and supervised release sentence for Mr. McClure, pursuant to the factors laid out by Congress in 18 U.S.C. § 3553. This Court must render a sentence that is "sufficient, but not greater than necessary" to serve the four main purposes of sentencing.[7] These purposes include: (1) retribution/just desert ("reflect the seriousness of the crime," "promote respect for the law," and "provide just punishment for the offense"),[8] (2) specific and general deterrence ("afford adequate deterrence to criminal conduct"),[9] (3) incapacitation ("protect the public from further crimes of the defendant"),[10] and (4) rehabilitation ("provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner").[11]

In addition to considering the main purposes of sentencing, this Court must also consider: (1) the nature and circumstances of Mr. McClure's

[7] 18 U.S.C. § 3553(a).
[8] 18 U.S.C. § 3553(a)(2)(A).
[9] 18 U.S.C. § 3553(a)(2)(B).
[10] 18 U.S.C. § 3553(a)(2)(C).
[11] 18 U.S.C. § 3553(a)(2)(A).

offense,[12] (2) the history and characteristics of Mr. McClure,[13] (3) the sentences available to the Court,[14] (4) the applicable advisory sentencing guidelines range and any pertinent policy statements issues by the Sentencing Commission,[15] (5) restitution to any victims,[16] and (6) the avoidance of "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[17]

Mr. McClure respectfully requests that this Court impose a sentence of 84 months (7 years) in the Bureau of Prisons (BOP), followed by a term of supervised release of 156 months (13 years), with conditions including all mandatory conditions as well as mental health counseling and substance abuse treatment. Mr. McClure also requests that this Court suggest to the BOP that he be housed as close to Jacksonville as possible and in a facility that provides him with necessary sex offender, mental health, and substance abuse treatment programming. This sentence would be sufficient to meet the statutory purposes of federal sentencing in consideration of the statutory sentencing factors.

---

[12] 18 U.S.C. § 3553(a)(1).
[13] *Id.*
[14] 18 U.S.C. § 3553(a)(3).
[15] 18 U.S.C. § 3553(a)(4)-(a)(5).
[16] 18 U.S.C. § 3553(a)(7).
[17] 18 U.S.C. § 3553(a)(6).

## History and Characteristics of Mr. McClure

Mr. McClure was only 24 years old when he was arrested in this case. At that point, he was not far removed from a chaotic childhood marred by mental and physical abuse, learning difficulties, the contentious divorce of his parents, and instability through frequent moves, substitute parents, school changes. Mr. McClure was born in Cairo, Georgia, but before he returned to Georgia for his last two years in high school, he lived in Jacksonville, Tampa, Maryland and Texas. His parents' marriage was volatile, and their divorce was finalized when Mr. McClure was eight years old.[18]

Mr. McClure's parents, Doug Alvin McClure and Natasha Payne, were married when they were both 18 years old, and Mr. McClure was born when they were 21 years old. Starting when Mr. McClure and his three brothers were very young, Doug McClure became physically and verbally abusive towards his family. He was a chronic alcoholic and addicted to drugs, including opioids. Although not every incident of abuse was reported to law enforcement, records show that Doug McClure has a significant history of battery and related charges starting in early 2007, when Mr. McClure was only five years

[18] *See* Duval County case no. 16-2009-DR-2460, Final Judgment for Dissolution of Marriage (Feb. 10, 2010). A redacted copy of that Order and Natasha Payne's Petition for Dissolution (Mar. 24, 2009) were filed with this Memorandum as an Exhibit.

old.[19] Doug McClure was in and out jail until Mr. McClure turned 15 years old.

Doug McClure was charged with domestic battery in March 2007.[20] He was charged with felony battery in March 2008.[21] One month later, he was charged with criminal mischief and petit theft.[22] In December 2008, he was charged with domestic battery.[23] Just seven days later, he was charged in two separate cases with burglary with battery and criminal mischief.[24] In September 2009, he was the subject of a repeat violence injunction.[25] In January 2014, he was charged with domestic battery.[26] In November 2014, he was charged with possession of marijuana.[27] In May 2015, he was charged with felony battery and a few days later was the subject of a domestic violence injunction.[28] In November 2018, he was charged with criminal mischief.[29]

In Natasha Payne's Petition for Dissolution, she wrote that shared custody would be detrimental to her children because "before and after the separation[,] the children, especially the older two, were subjected to verbal

---

[19] A list of Doug McClure's Florida court cases is filed with this Memorandum as an Exhibit.

[20] Pasco County case no. 51-2007-MM-1729.

[21] Hernando County case nos. 27-2008-CF-1008 and 27-2008-MM-1085.

[22] Pasco County case nos. 51-2008-MM-990118 and 51-2008-MM-2606.

[23] Pasco County case no. 51-2008-MM-9835.

[24] Pasco County case no. 51-2008-CF-7978 and 51-2008-MM-9954.

[25] Pasco County case no. 51-2009-DR-5137.

[26] Pasco County case no. 51-2014-MM-693.

[27] Pasco County case no. 51-2014-MM-7966.

[28] Pasco County case nos. 51-2015-CF-3365 and 51-2015-DR-2585.

[29] Pasco County case no. 51-2018-MM-6002.

and violent rages, physical and mental abuse[,] and neglect by their father."[30] She also wrote that denying visitation rights is in the best interests of the children because Doug McClure "put great (possibly irretrievably) emotional scarring on the children, resulting in counseling."[31] Doug McClure denied the abuse allegations and accused his estranged wife of hiding the children from him.

However, Circuit Judge W. Gregg McCaulie wrote that he found the abuse allegations to be true.[32] He had previously halted unsupervised visitation until the father submitted to a full substance abuse evaluation, which the father said he could not do because he had no transportation, no money and no job.[33] He wrote that Doug McClure "has a history of domestic violence, drug abuse[,] and mental health issues, which includes a substantial criminal history."[34] He noted that, "during the Husband's last contact with the Wife and children, the Husband committed an act of domestic violence in the presence of the children and which placed one of the infant twins in immediate danger."[35] He continued, "That episode of domestic violence escalated and the Husband ultimately threatened to harm himself or the family. Law

[30] Petition for Dissolution, Duval County case no. 16-2009-DR-2460.
[31] *Id.*
[32] Final Judgment for Dissolution of Marriage, Duval County case no. 16-2009-DR-2460.
[33] *Id.*
[34] *Id.*
[35] *Id.*

enforcement took him into custody and he was the subject of a Baker Act commitment. Unfortunately, this is not an isolated incident."[36] Additionally, Natasha Payne was never able to get Doug McClure to make the full child support payments ordered by the court in 2010. Attempts to get past-due child support are ongoing.[37]

After the divorce, Natasha Payne married Wade Payne, who served in the United States Navy at the time. This led to the family frequently relocating. They moved from Florida to Maryland, from Maryland to Texas, and then from Texas to Georgia. Mr. McClure spent time being raised by his maternal grandmother in Texas until moving to Valdosta, Georgia, when he was 16 to be raised by his aunt and uncle. Records from Valdosta High School show they were functioning as his guardians.[38]

Mr. McClure was diagnosed with Specific Learning Disability at Valdosta High School.[39] He was placed in an Individualized Education Program and enrolled in special education classes. After an altercation with

---

[36] *Id.*

[37] *See* Order Authorizing Issuance of Writ of Bodily Attachment (July 23, 2026), Duval County case no. 16-2010-DR-521.

[38] Mr. McClure's records from Valdosta High School were filed with this Memorandum as Exhibits.

[39] A specific learning disability is "a disorder in [one] or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations." 20 U.S.C. § 1401(30)(A). The "term includes such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia." § 1401(30(B).

his brother at school, he was transferred to the Home Learning Center Alternative School and was home schooled by his aunt. He earned his GED in 2020 when he was 19 years old.

Mr. McClure has long suffered from mental health issues, but did not speak up about it or ask for help until very recently.[40] He quietly suffered through his tumultuous youth and after being victimized at a young age.[41] He reports some history of suicidal ideation as a teenager. When he was about 18 years old, he made steps towards ending his life by jumping off a bridge, but a Georgia State Trooper intervened. Another time, he attempted to overdose prescription medications.

On October 8, 2025, one day after execution of the search warrant in this case and after calling Homeland Security Investigations to cooperate by giving consent for the agent to search his phone, Mr. McClure finally sought professional help by checking himself into the Mental Health Resource Center (MHRC) Crisis Stabilization Unit (CSU) South in Jacksonville. He ended up staying in the unit for six days before being discharged. While there, he was diagnosed with Schizoaffective Disorder Bipolar Type and Depressive Disorder. The psychiatrist prescribed him Risperdal, an antipsychotic

---

[40] Redacted mental health records from Mental Health Resource Center (MHRC) South in Jacksonville were filed as an Exhibit with this Memorandum.
[41] *See* PSR ¶ 50.

medication, and Prozac, an antidepressant medication. After being arrested on the warrant in this case and being housed at the Nassau County Jail, Mr. McClure has been treated for his Depressive Disorder with Zoloft. He reports he is doing well with the current medication and has not had any psychotic episodes, which is probably due to him not having access to illegal drugs, including psilocybin mushrooms.

As noted in the PSR, Mr. McClure admits to a history of drug abuse and addiction, which started as an attempt to self-medicate for undiagnosed depression. He started smoking and consuming cannabis/marijuana as a teenager and used it mostly daily up until his arrest in this case. He discovered cocaine when he was 21 years old and used it daily for about a year. At the age of 22, he was introduced to psilocybin mushrooms, popularly known as "magic mushrooms," "mushrooms," or "shrooms." He admits to using mushrooms on a weekly basis for about two years from the age of 22 until just before his treatment at MHRC.

Using drugs – particularly mushrooms – this often, especially before the age of 25 when the brain is still developing, can be highly detrimental to mature cognitive functioning. One study remarked that "Emerging evidence suggests that "adolescents [(persons 18 to 24 years old)] may be more vulnerable to adverse outcomes in relation to psychedelic use compared to

adults [(persons at least 25 years old)]."[42] The adverse outcomes include "negative personality change," as well as "depressed mood, sensory disturbances, persisting anxiety, confusion, sleeping problems, and feelings of unreality."[43] Another study observed that, depending on the dose, psilocybin use can lead to a decrease in executive function.[44]

Mr. McClure now acknowledges that prior to his arrest he had a severe drug abuse problem. In fact, he is thankful for how the arrest helped him see this clearly. Now that he has not used illicit mind-altering substances for the past eleven months, he understands the severe impact that using marijuana, cocaine, and psilocybin had on his wellbeing and decision-making. He recognizes that he was self-medicating instead of seeking professional help for his mental health issues. He is determined to seek treatment and desires to have mental health treatment and substance abuse treatment be integrated into this Court's sentence.

Despite his issues in school, untreated mental health issues, and chronic drug abuse, Mr. McClure is a hard worker and has been seeking employment or gainfully employed since the age of 18. As laid out in the PSR, he held a job

---

[42] David Sjöström, et. al., *Adverse outcomes following psychedelic use in adolescents and adults: associations with age and personality traits*, 20 CHILD ADOLESC. PSYCHIATRY MENT. HEALTH 32 (Feb. 24, 2026).

[43] *Id.*

[44] Shakila Meshkat, et. al., Impact of Psilocybin on Cognitive Function: A Systematic Review, PSYCHIATRY & CLINICAL NEUROSCIENCE, 744-64 (Oct. 1, 2024).

in each city he moved to.[45] He worked as a dietary aid at a hospital in Valdosta, Georgia. He later worked as a rebar bender for a company in San Antonio, Texas. In Florida, he worked a few weeks for a landscaping company, and most recently he worked several months as a pool plumber with a business in Jacksonville.

Despite his crimes in this case, Mr. McClure has a lot of positive qualities that are attested to in the letters submitted by his mother and brother. Natasha Payne comments that Mr. McClure "was always a very sweet and helpful child." He always offered to help other people and was concerned for others' well-being. She described him as "very kind hearted" and possessing "fundamental goodness." Cody McClure notes that his brother is a hard worker who was trying to build his life and become independent prior to his arrest in this case. He helped around the house and was respectful toward his family. Cody also notes that Mr. McClure is someone that Cody's young son looks up to.

**Nature and Circumstances of the Offense**

As Mr. McClure will explain to this Court at the Sentencing Hearing, he is genuinely remorseful for the crimes he committed, and he has been since the inception of this case. As Natasha Payne noted in her letter, through her

[45] See PSR ¶¶ 64-68.

conversations with Mr. McClure since his arrest, it is apparent to her that he has taken responsibility and shown remorse for his actions. From the initial conversation with undersigned counsel, Mr. McClure was very adamant that he intends to plead guilty and accept the consequences. He did not try to deny responsibility or otherwise wiggle his way out of trouble. He quickly acknowledged the severity of his crimes and developed an understanding of how his downloading, viewing, and sharing of CSAM images furthers the victimization of those depicted.

At no time did Mr. McClure put up a fight or otherwise make the agents' jobs extra difficult. While he was initially hesitant to completely admit to the presence of CSAM on his devices when first confronted by the agents, it did not take long for him to concede that there was likely CSAM in his possession. He participated in several consensual conversations with agents in the days following execution of the search warrant. A day after his initial interview with agents, after the shock of the search warrant wore off, he called the agents back to give them access to his cell phone and consent to them taking over his identity on the Kik application he used in connection with these crimes. He told them that he is "probably going to jail" because of what was on his phone. He did not attempt to flee or otherwise cover up his crimes.

**Regarding the Advisory Sentencing Guidelines**

The advisory guidelines applicable to this case results in a Total Offense Level of 34 and a Criminal History Category of I, leading to a sentencing range of between 151 months (12 years and 7 month) and 188 months (15 years and 8 months) in prison. A sentence within this suggested range would be far greater than necessary to meet the purposes of sentencing.

As the Sentencing Commission noted in its 2021 Report, district court judges across the country "have continued to sentence most non-production child pornography offenders below their guidelines ranges."[46] Judges of various backgrounds and philosophies recognize that the enhancements in USSG § 2G2.2 apply in far too many cases today, but were originally "intended to target more serious and more culpable offenders."[47] In fiscal year 2019, only 30% of non-production offenders received a sentence *within* the guideline range.[48] The vast majority (59%) received a sentence that varied *below* the guideline range.[49]

Some of the problematic enhancements at play in these cases, including for Mr. McClure are the two-level enhancement for use of an electronic device,

---

[46] *See* UNITED STATES SENTENCING COMMISSION, FEDERAL SENTENCING OF CHILD PORNOGRAPHY: NON-PRODUCTION OFFENSES at 3 (June 2021).
[47] *See* Id. at 5 ("The average guideline minimum for non-production child pornography offenders increased from 98 months in fiscal year 2005 to 136 months in fiscal year 2019.")
[48] *Id.*
[49] *Id.*

the five-level enhancement for the number of images, and the four-level and two-level enhancements related to the nature of the images and the ages of the victims depicted. Due to advancements in technology making the acquisition and storage of CSAM easier, these enhancements apply in many more cases than in the past, and therefore do not effectively distinguish the levels of culpability of modern offenders. For example, the computer enhancement was introduced at a time when internet access was rarer and it was remarkable for a defendant to use an electronic device for these crimes. However, in today's world, it would be nearly impossible for a defendant to access CSAM by any other means.

**Conclusion**

Mr. McClure's requested sentence of 84 months (7 years) in prison, followed by 156 months (13 years) of supervised release, is sufficient to meet Congress's requirements for sentencing in federal criminal cases. The mandatory minimum sentence that Congress directs for those convicted of distribution of CSAM is 60 months (5 years) in prison followed by 60 months (5 years) on supervised release. Mr. McClure's suggested sentence exceeds the minimum prison sentence by 2 years and the minimum supervised release sentence by 8 years. Mr. McClure recognizes that the circumstances of his case call for more than the Congressionally-mandated minimum sentence, but argues that they call for the less than the agency-advised guideline sentence.

This proposed sentence recognizes that this Court has sentencing options beyond lengthy imprisonment. Supervised release following incarceration is not a walk in the park and meets the purposes of sentencing. It promotes respect for the law, acts as a strong deterrent against criminal activity, limits the freedom of the defendant thus protecting the public, and is a much better vehicle than imprisonment to provide a defendant with education, training, medical care, and other correctional treatment, including mental health and substance abuse treatment.

Mr. McClure is a person who made a series of grave mistakes and recognizes that. He should be given a sentence that not only punishes him but also provides him with the chance of redemption. His time in prison, on supervised release, and the rest of his life thereafter as a registered sex offender will be tough. Nevertheless, he is prepared to accept the sentence of this Court.

**CHARLES L. PRITCHARD JR.**
**FEDERAL PUBLIC DEFENDER**
**MDFL**

Respectfully Submitted By:

*s/ Scott T. Schmidt*
Scott T. Schmidt
Assistant Federal Public Defender
Florida Bar No. 92534
200 West Forsyth Street, Suite 1240
Jacksonville, FL 32202
Telephone: (904) 232-3039
Fax: (904) 232-1937
Email: scott_schmidt@fd.org